Thomas BLACK and Evelyn Black, Appellants,

v.

Donald K. BIRNER, Appellee.

No. 2003–CA–002760–MR.

Court of Appeals of Kentucky.

March 11, 2005.

Discretionary Review Denied by Supreme Court Jan. 11, 2006.

---

W.E. Rogers, III, Hopkinsville, KY, for appellant.

James R. Redd, III, Fletcher and Redd, Hopkinsville, KY, for appellee.

Before JOHNSON and McANULTY, Judges; HUDDLESTON, Senior Judge.[1]

### OPINION VACATING

HUDDLESTON, Senior Judge (Assigned).

Thomas and Evelyn Black appeal from a Trigg Circuit Court summary judgment and an order granting injunctive relief to Donald K. Birner. Birner sued the Blacks claiming that a building they had constructed on their property in a subdivision in Cadiz violated various restrictive covenants. The circuit court agreed with Birner, granted his motion for summary judgment and ordered that the structure be removed. On the Blacks' motion, the court suspended injunctive relief pending the outcome of this appeal.

The question presented is whether restrictive covenants, ostensibly created by a majority of lot owners in a subdivision, that purport to revive restrictions created by the original developer, are enforceable against all lot owners in the subdivision. Because we agree with the Blacks that they are not, we reverse the judgment and vacate the injunction.

The subdivision in question, Canton Heights Estates Section I, was created in 1965. In that year, the developer, Russell R. Smith, President of the Cedar Bluff Land Company, filed a series of restrictions ("the original restrictions") at the Trigg County Clerk's office. In addition to imposing various restrictions on the types of buildings that would be permitted in the subdivision, the document stated that the duration of the restrictive covenants was to be twenty years, with an opportunity after ten years had passed for a majority of landowners to alter them. The original restrictions provided, in relevant part, as follows:

The Cedar Bluff Land Company, Inc. does furthermore establish the following covenants which shall bind it and each of the purchasers of the lots in said subdivisions, which restrictive covenants shall run with the lands described in said plats and shall be binding on the undersigned and all persons claiming under them:

---

1. Senior Judge Joseph R. Huddleston sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

1. **These covenants are to run with the land and shall be binding on all persons and parties claiming under them until January 1st 1975, at which time said covenants shall be automatically extended in force and effect for an additional period of ten years, unless by a majority of the owners of the lots it be agreed to change said covenants in whole or in part.**

2. For violation of any of the covenants herein set forth any party hereto may prosecute appropriate proceedings under the law of the State of Kentucky, such as for damages or for abatement of a nuisance, or, in case of attempted violation, for prevention and restraint.

3. All lots in said Subdivision shall be residential, and shall be so known and designated and described, except those lots designated as commercial on the plot map.

. . . .

5. No buildings shall be constructed with any siding material other than finished wood, brick, stone or metal alloys, except for contilever [sic] type construction, foundations will be continuous around the entire periphery of the structure, except for spaces for doors and windows if such are used.

. . . .

8. No building shall be erected, placed or permitted to remain on a lot other than a single family dwelling, with a garage and boathouse (if such garage and/or boathouse be desired by owner), such garage and boathouse to conform, as to materials, to the requirements for the dwelling.

(Emphasis supplied.)

The parties to this appeal, and the circuit court, agree that these restrictions lapsed in 1985 under their own terms.

On August 19, 1988, a group of homeowners in the subdivision republished and restated the original restrictions, with the amendment that they were now to run in perpetuity. The document they filed ("the 1988 restrictions") provides, in relevant part, that:

WHEREAS, certain restrictions have existed for the above Subdivision since its initial development, which restrictions are of record in the Trigg County Court Clerk's Office in Misc. Book 2, page 561, and also in Misc. Book 12, page 397, and

WHEREAS, the majority of the lot owners of Canton Heights Estates Section I have agreed to republish, restate, and amend the restrictions as set out hereafter and as evidenced by the consent forms held in the Neighborhood Association files,

NOW, THEREFORE, the following are set out as Restrictions for Canton Heights Estates, Section I, which shall bind all owners and purchasers of the lots in said subdivision, which restrictions and restrictive covenants shall run with the land described in the respective plat and/or deeds of lots in this subdivision:

1. These covenants are to run with the land and shall be binding on all persons and parties claiming under them in perpetuity.

This document was signed by "Gabe A. Payne, Chairman," and attested to by "Maybelle Payne, Secretary." An attorney, C.A. Woodall III, certified that he had prepared the instrument. There is no indication in the record as to who constituted the majority of lot owners, when or how the Neighborhood Association was formed, or whether it still exists.

The Blacks purchased five adjoining lots in the Canton Heights Estates subdivision on November 6, 2001. The deed convey-

ing the property states, in relevant part, that:

> This conveyance is subject to all restrictions and easements of record which affect the subject property, and specifically [the original restrictions].

No specific reference was made in their deed to the 1988 restrictions. A little over a year later, the Blacks began building a large shed that straddles two of their lots, neither of which is improved with a single-family residence. The shed is made of metal with open doors at both ends and measures about 40 by 60 feet. Birner, a homeowner in the subdivision, filed a *pro se* complaint seeking injunctive relief on January 23, 2003. He claimed that the structure violated the 1988 restrictions because of its location and composition. Birner argued that the language in the Blacks' deed had put them on notice that their land was encumbered by restrictive covenants. The Blacks responded that the 1988 restrictions were void and unenforceable because they were not created by the original developer, but were arbitrarily imposed by a group of unidentified homeowners on all the lots in the subdivision. Both parties moved for summary judgment.

In granting summary judgment to Birner, and ordering the shed removed, the circuit court agreed with Birner that the Blacks' deed had provided them with sufficient notice of the 1988 restrictions. The court disagreed with the Blacks' argument regarding the validity of the 1988 restrictions, stating that it had reviewed the 1988 restrictions and found that there was nothing on the face of the instrument that

appeared to be either irregular or illegal. The court also noted that the Blacks had failed to challenge the validity of the restrictions until an attempt was made to enforce them. Finally, the court stressed that it was acting in equity on behalf of the majority of the lot owners to preserve the upscale, residential character of the subdivision.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [2] The circuit court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." [3] On appeal, we are to determine "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." [4] "Interpretation or construction of restrictive covenants is a question of law. Therefore, we review this matter de novo." [5]

We turn now to the substantive issues in this appeal. The Blacks do not dispute that their shed is in contravention of the terms of the 1988 restrictions. They challenge the inherent validity of those restrictions. They contend that the 1988 restrictions are void and unenforceable because they were executed by an unspecified majority of subdivision lot owners and were recorded well after the original

2. Ky. R. Civ. Proc. (CR) 56.03

3. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991) (citations omitted).

4. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App.1996).

5. *Colliver v. Stonewall Equestrian Estates Assoc., Inc.*, 139 S.W.3d 521, 523 (Ky.App. 2004).

restrictions had expired. They maintain that the restrictions do not therefore "affect" their property under the language of their deed.

Although the parties do not cite and we have not found any Kentucky case law that directly addresses the question of whether a majority of lot owners may act together to create restrictions that are enforceable against every lot owner in a subdivision, a survey of relevant cases from other jurisdictions, as well as the secondary literature regarding the creation of valid covenants, supports the view that the 1988 restrictions were not validly created and are, therefore, unenforceable against the Blacks.

While it is true, as Birner has noted, that Kentucky law has grown more favorable toward the enforcement of restrictive covenants,[6] this greater willingness to enforce such restrictions is premised on the assumption that the covenants to be enforced are valid.

In the classic case of *Korn v. Campbell*,[7] the Court of Appeals of New York, that state's highest court, grouped restrictive covenants into three broad categories: (1) those created by a developer at the time the land in question is being subdivided; (2) those imposed by a grantor when selling a portion of his or her land; and (3) those agreed upon by owners of adjoining lands for their mutual benefit.[8] The 1988 restrictions fail to meet the standards of any of these categories.

The first class consists of those "which are entered into with the design to carry out a general scheme for the improvement or development of real property."[9] In this class, "an owner of a large plot or tract of land divides it into building lots, to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises."[10]

More recently, developers have adopted the practice of setting out the covenants in a single declaration that is recorded against the lots in the development before any conveyances are made. The declaration is then incorporated by reference in subsequent deeds to various lots.[11]

> Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefore lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract.[12]

"In such cases the covenant is enforceable by any grantee as against any other, upon the theory that there is a mutuality of covenant and consideration, which binds each and gives to each the appropriate remedy."[13] This type of covenant is en-

---

6. *See, e. g., Colliver, id.* at 523, where this Court observed that, since the 1950s, "Kentucky has approached restrictive covenants from the viewpoint that they are to be regarded more as a protection to the property owner and the public rather than as a restriction on the use of property[.]"

7. 192 N.Y. 490, 85 N.E. 687 (1908).

8. *Id.* at 689.

9. *Id.*

10. *Id.*

11. *See* Gerald Korngold, PRIVATE LAND USE ARRANGEMENTS: EASEMENTS, REAL COVENANTS, AND EQUITABLE SERVITUDES § 9.03, p. 268 (1990).

12. *Korn, supra,* note 9, at 689.

13. *Id.*

forceable by and against subsequent purchasers.

■■■ The original restrictions filed by the developer, Russell R. Smith, in 1965 fall into this first category. But these covenants expired by their own terms in 1985. Although Birner has argued that no statement was made in the original restrictions that they could not be "renewed" or that further restrictions could not be filed after 1985, the original restrictions clearly stated that they would expire in twenty years, and did not provide any means or mechanism whereby they could be perpetuated or revived. "[A]s a matter of judicial construction the court may not substitute what the grantor may have intended to say for the plain import of what he said." [14]

> The second class [of covenants] embraces those cases in which the grantor exacts the covenant from his grantee, presumptively or actually, for the benefit and protection of contiguous or neighboring lands which the former retains. In such cases the grantees, if there are more than one, cannot enforce the covenant as against each other, although the grantor and his assigns of the property benefited may enforce it against either or all of the grantees of the property burdened with the covenant. [15]

■■■ This is clearly not the situation here. The original grantor did not retain any contiguous or neighboring lands; and the restrictions in this case are meant to be mutually enforceable by all the lot owners against each other. [16]

■■■ Finally, "there is a third class, where there are mutual covenants between owners of adjoining lands, in which the restrictions placed upon each produce a corresponding benefit to the other, and in such a case, of course, either party or his assigns may invoke equitable aid to restrain a violation of the covenant." [17]

The 1988 restrictions fall within this third category wherein adjoining landowners create covenants for their mutual benefit. The barrier to their enforcement is precisely their lack of mutuality. They were created by an unspecified majority of lot owners, yet in order to be effective must bind all lot owners in the subdivision. Birner insists that it was not necessary to gain the consent of all the lot owners in order to make the restrictions binding. He argues that they were filed without any objections, that the original restrictions evinced an intent that the will of the majority should prevail, and that requiring unanimity is neither "practical, feasible, reasonable or fair." We disagree.

In a factually analogous case, *Brandwein v. Serrano*, [18] a common grantor had created a development around a courtyard. The restrictions on the development stated that property owners were not permitted to fence their separate parcels, as this would obstruct the courtyard. The original declaration of restriction lapsed. Several months later, 62 of the 73 owners of

14. *La Vielle v. Seay*, 412 S.W.2d 587, 592 (Ky.1966).

15. *Korn, supra*, note 9, at 689.

16. Birner has invoked the doctrine of implied reciprocal covenants although he acknowledges that it was not raised before the circuit court. This doctrine generally applies to covenants in this second category when a grantor retains some land and conveys the rest subject to restrictions. Under the doctrine of implied reciprocal covenants, the land remaining with the grantor may also be subject to the restrictions if a general plan attaches to all of the lots.

17. *Korn, supra*, note 9, at 689.

18. 72 Misc.2d 95, 338 N.Y.S.2d 192 (N.Y.Sup. Ct.1972).

the parcels on the block executed and recorded an "Extension Agreement" that provided for an extension of the courtyard restrictions found in the original declaration. Two lot owners subsequently fenced their properties; other lot owners sued to enforce the covenants against them. The Supreme Court of Queen's County, New York, held that the covenants were not enforceable, explaining that:

> Adjoining landowners may mutually covenant to bind their respective properties for their reciprocal benefit. The restrictions placed upon each produce a corresponding benefit to the other. **An agreement imposing a burden on property may be executed only by one who holds title to the property.** Nonconsenting landowners are thus not bound by restrictions imposed and easements granted by the other landowners.[19]

Concluding, the court said that:

> It is in consideration of the whole common court that the parties to the Extension Agreement agreed to burden their parcels. The burdens they sought to extend were universal burdens. The parties could not accomplish their reimposition without the consent of all the landowners. The benefit they sought to preserve was the continued existence of the common mall, the usage of which they had benefited from since 1925. They could not achieve this benefit without the consent of all the landowners. For the agreement to be effective for the accomplishment of the intended result, the continuation of the neighborhood scheme, it was essential that all of the then owners of property within the block consent to the reimposition of the restrictions and easements. Accordingly, the court holds that the lack of assent on the part of some of the then owners of property on the block prevented the 'Extension Agreement' from ever attaining validity as a binding restriction upon the property of those persons who did properly sign it.[20]

Similarly, in this case the 1988 restrictions were not signed by all the lot owners, yet the restrictions are "universal" in the sense that they require the consent of all lot owners to be effective, that is, to preserve the residential character of the subdivision.

■ Under Kentucky law, "[t]he criteria for determining whether a covenant runs with the land or is merely personal between the grantor and the grantee include the intent of the parties, whether the covenant must affect or concern the land with which it runs, and whether privity of estate exists between the party claiming the benefit and the party who rests under the burden."[21] The essential element of privity is lacking in the case of the 1988 restrictions. To be valid, the restrictions would have to have been imposed on the land in perpetuity by the original developer, by an agreement of all the lot owners, or by a valid neighborhood association created by the developer.[22]

■ Birner has raised two further arguments in defense of the 1988 restric-

**19.** *Id.* at 195 (emphasis supplied) (citations omitted).

**20.** *Id.* at 196.

**21.** *Oliver v. Schultz,* 885 S.W.2d 699, 700 (Ky.1994)(quoting *Bishop v. Rueff,* 619 S.W.2d 718 (Ky.App.1981)).

**22.** The "necessary nexus between the enforcer, the benefited land, and the covenant exists because the association is acting as the agent of the lot owners." Korngold, *supra,* note 13, at § 9.14, p. 330. No such agency relationship existed in this case.

tions. First, he points to the fact that a single grantor may place restrictions on property before conveying it, and that by accepting a deed, the grantees become bound by the restrictions. Birner argues that the language in the Blacks' deed stating that "[t]his conveyance is subject to all restrictions and easements of record which affect the subject property" signified that their individual grantor was placing the 1988 restrictions on the property. It is a well-established principle, however, that such language in a deed is not sufficient in and of itself to make the restrictions enforceable.

In *Wiley v. Schorr*,[23] the Texas Court of Civil Appeals was confronted with three different "Agreements as to Restrictions," each of which had been signed by some but not all the lot owners in a subdivision. The Court explained that "[t]he three Agreements as to Restrictions, by their very terms, purported to restrict the entire subdivision. Since the plan was not joined in by all the lot owners, the Agreements did not create enforceable restrictions."[24] Further,

> [the appellee's] deed contained the phrase "subject to all of the restrictions now in force." Appellant's contention that this phrase encumbered the lots with restrictions is without merit. Recitals of this type are designed to protect a grantor in the event there are any restrictions on property in effect at the time of a conveyance. Thus, the insertion of such recitals in deeds is merely precautionary. They do not create restrictions if none existed at the time of the conveyance.[25]

This principle was succinctly stated in an earlier Texas case: "While conveyances 'subject to' restrictions give notice that such restrictions are of record, they are not an acknowledgment of the validity of such restrictions."[26]

In a similar case, the Supreme Court of Arizona interpreted the "subject to" language in the same manner:

> The point is that reference to restrictions in a 'subject to' clause will not, without more, make such restrictions applicable to the deeded property if, as a matter of fact, they are otherwise inapplicable. Here, the ... restrictions are by their very terms inapplicable to [the] lot ... and we hold that they cannot be carried over to apply to this lot merely by reference thereto in a 'subject to' clause.[27]

■ Birner also argues, and the circuit court's opinion implied, that the 1988 restrictions were validated in some manner because the Blacks had received sufficient notice of them. Although we agree that the language in the Blacks' deed and other indications may have been sufficient to put them on notice of the restrictions, this is irrelevant if the covenants themselves are invalid. Recording and notice do not of themselves render the restrictions valid and enforceable. As the Kentucky Supreme Court has said:

> "[T]he grantee is charged with notice of an encumbrance upon property created by an instrument which is of record, notwithstanding the fact that it may exist only collaterally in the chain of title." However, **such an encumbrance must**

---

**23.** 594 S.W.2d 484 (Tex.Civ.App.1979)

**24.** *Id.* at 487.

**25.** *Id.* at 487 (citations omitted).

**26.** *Stout v. Rhodes,* 373 S.W.2d 94, 95 (Tex. Civ.App.1963).

**27.** *Smith v. Second Church of Christ, Scientist,* 87 Ariz. 400, 351 P.2d 1104, 1109 (1960).

be enforceable in order to bind the grantee.[28]

The circuit court erred in granting summary judgment to Birner because, as a matter of law, the 1988 restrictions are not enforceable against the Blacks.  We reverse the judgment and vacate the injunction and remand this case to Trigg Circuit Court with directions that summary judgment be granted to the Blacks.

ALL CONCUR.

28.  *Oliver, supra* at 700. (emphasis supplied).