**KENTUCKY EMPLOYERS' MUTUAL INSURANCE, Appellant**

v.

**Randy ELLINGTON; R & J Cabinets; Hon. Jonathan Weatherby, Administrative Law Judge; and Workers' Compensation Board, Appellees**

2013–SC–000802–WC

Supreme Court of Kentucky.

RENDERED: MAY 14, 2015

Counsel for Appellant: Barry Lewis, Lewis and Lewis Law Offices, 151 East Main Street, Suite 100, PO Box 800, Hazard, Kentucky 41702–0800

Counsel for Appellee, Randy Ellington: Timothy Jay Wilson, Wilson & McQueen, 309 North Broadway, Lexington, Kentucky 40508

Counsel for Appellee, R & J Cabinets: Scott Mitchell Burns Brown, Ferreri & Fogle, PLLC, 300 East Main Street, Suite 400, Lexington, Kentucky 40507

OPINION OF THE COURT BY
JUSTICE NOBLE

The Appellant, Kentucky Employers' Mutual Insurance (KEMI), appeals from a decision of the Court of Appeals holding that the Appellee, Randy Ellington, was covered by a workers' compensation policy it issued. The policy named Ellington and his business, a sole proprietorship with the assumed name of R & J Cabinets, as "insureds." At the same time, the policy included a specific exclusion from coverage of Ellington as the sole proprietor. The Court of Appeals found the policy to be ambiguous because of these competing terms and construed it in Ellington's favor to provide coverage for his injuries. This Court concludes that the policy as issued, on its face, is clearly not a personal policy, but is rather a business policy purchased by a sole proprietor, and no ambiguity requires a different conclusion. Ellington, as the sole proprietor, was not entitled to benefits under the policy. For that reason, the Court of Appeals is reversed.

## I. Background

In December 2010, Ellington slipped on a patch of ice at a job site and broke his femur. Some time later, he filed for workers' compensation benefits under a workers' compensation insurance policy issued to him by KEMI.

Ellington owned and operated R & J Cabinets as a sole proprietorship. At times, R & J Cabinets employed part-time workers, usually one at a time, but at the time of Ellington's work-related injury, only Ellington remained with the business. He does not appear to have had any employees for at least a year leading up to his injury.

The KEMI policy was originally purchased in 2006. At that time, Ellington had at least one employee, which he reported to KEMI. The original application for the policy stated that Ellington was a "sole proprietor" and that he was not covered by the policy.

The policy itself was issued to "Randy Ellington DBA R & J Cabinets," and was reissued annually. A section of the policy titled "Classifications" laid out how the premium was calculated in part.[1] It included a table showing how the "manual premium" was set. This table included a column titled "CLASS RATING AND MANUAL PREMIUM DETAIL," under which Ellington's name was listed with a code showing the type of work done by the business. Below this was another table showing how the final premium was calculated (i.e., by adding an "expense constant" and a special fund assessment to the manual premium).

At the time of the accident, the policy also included a number of attached endorsements. Most of these endorsements have no bearing on this case, as they lay out things like how tax is assessed on the policy. But two of the endorsements are relevant.

One of these was headed "SOLE PROPRIETORS, PARTNERS, OFFICERS AND OTHERS EXCLUSION ENDORSEMENT" (hereinafter "exclusion endorsement"). It specifically stated that there was no bodily injury coverage to any person in the attendant schedule.[2] The endorsement further stated that "remuneration" (i.e., salary or other earnings) of any person listed in the schedule was not used to set the policy premium, and that if KEMI was ever required to make any payment for bodily injury to a listed person, then that person agreed to *reimburse* the company. The only person listed on the attendant schedule was Ellington, whose name was included in a column headed "Excluded Individual Name." The next column of that schedule is headed "Excluded Individual Position," under which is written "Sole Proprietor."

A second endorsement was entitled "SCHEDULE OF NAMED INSUREDS AND WORK PLACES" (hereinafter "named-insured endorsement"). Under that title, this endorsement listed Randy Ellington and R & J Cabinets separately. The address for both Ellington and R & J Cabinets were the same.

The first policy expired on its anniversary in 2007, but it was renewed annually thereafter. In 2007 and 2008, Ellington completed a "Policyholder's Mail Audit," which is sent out by the insurer at the end of each of the first few policy years to gather additional information upon which the premium was to be calculated. Those audit forms stated that *Ellington was not covered.* These forms, according to the ALJ's findings, require the business owner to list the number of employees he had during the policy year and the amount of payroll for the employees. This information is then used, in an after-the-fact manner, to calculate the final amount of pre-

---

1. According to testimony in the record, the manual premium was calculated based on the business's employee payroll, excluding money paid to Ellington. This calculation is not explicitly shown in the "Classifications" portion of the policy. Other documents, however, show that Ellington reported his employee payroll to KEMI from time to time.

2. The full language is as follows:

The policy does not cover bodily injury to any person described in the Schedule.

The premium basis for the policy does not include the remuneration of such persons.

You will reimburse us for any payment we must make because of bodily injury to such persons.

mium the business owner owes for the coverage extended to these employees over the past year. Ellington listed employees and payroll on those forms.

It was this policy under which Ellington made his claim for benefits. KEMI denied his claim, arguing that it was not covered because of the sole-proprietor exclusion endorsement and other extrinsic evidence.

After discovery, the Administrative Law Judge ("ALJ") conducted a formal hearing. The evidence at the hearing established that Ellington's premium changed when he no longer had employees but that he still had a premium. Ellington claimed that that was part of why he believed he was covered by the policy.

Other testimony, however, established that business owners such as Ellington often maintained coverage even when business was slow, and presumably the number of employees down (even to zero), so that extra labor could be added to compete for a particular job. The testimony also established that some jobs require a contractor to have workers' compensation insurance before a bid could be submitted. In fact, the record shows that Ellington actually requested a certificate of insurance in 2010 so that he could be considered for a job with a roofing company. Given the possibility of up-the-ladder liability, such coverage is often required by larger companies that hire smaller companies for particular work.

Other testimony established that if Ellington had been included under the policy, his annual premium would have increased more than sixfold, from approximately $1144 to $7200.

After the hearing, the ALJ issued findings of fact and conclusions of law. He addressed only the question whether Ellington was covered by the policy, concluding that Ellington was not covered.

The ALJ began by noting that under KRS 342.012, a sole proprietor like Ellington must specifically elect to be covered by a workers' compensation coverage and that to do so, he must obtain a specific endorsement on his insurance policy and pay a significant additional premium. No such endorsement had been sought or issued.

The ALJ also noted Ellington's arguments that his listing by name as a named insured separate from R & J Cabinets on the named-insured endorsement suggested he had personal coverage; that this at least created an ambiguity that should be resolved in his favor under *Kentucky Employers' Mutual Insurance v. Decker*, 2010–SC–000459–WC, 2011 WL 1642183 (Ky. April 21, 2011), an unpublished decision; and that it would be unreasonable for him to pay a premium if he had no employees if he was not personally covered.

The ALJ distinguished *Decker*, noting that the sole proprietor in that case had never had employees and was less sophisticated than Ellington, and that he had never signed audit forms specifically indicating a lack of coverage. The ALJ went on to conclude "that while there may have been some ambiguity due to listing of [Ellington] as a named insured, that ambiguity should have been clarified ... by the specific language of the policy which clearly states that he is not covered and by the individual audit forms that he specifically and individually signed which also clearly indicate that he personally was not covered." The ALJ again noted that the audit forms required Ellington to fill in the amount of his employee payroll and number of employees for a given year and "include[d] clear and unambiguous language indicating that Mr. Ellington was excluded from coverage." The ALJ also cited Ellington's education (high school and some vocational school as a marine

mechanic) and "presentation" at the hearing as showing sufficient sophistication to allow him to understand policy documents. He also noted that Ellington understood that his premiums were based on the amount of payroll he reported, and that he called KEMI multiple times to report a reduction in payroll in an effort to reduce his premiums. The ALJ also concluded that it was "reasonable for [Ellington] to want to maintain coverage even when the business was slow in case he needed to add extra labor to complete or apply for a particular job," and cited the fact that Ellington sought a certificate of insurance in 2010 to be considered for a contracting job. The ALJ also noted that after his fall, Ellington did not tell the hospital he had workers' compensation insurance and instead referred payment inquiries to his lawyer, whom he contacted while still in the hospital.

Based on these findings, the ALJ concluded that "it is not credible that [Ellington] believed he had workers' compensation coverage at the time of his injury in light of the weight of the evidence to the contrary." Because there was no coverage, the ALJ dismissed the claim.

The Workers' Compensation Board affirmed, concluding that the evidence did not compel a different result than that reached by the ALJ. In reaching this conclusion, the board reviewed and recited much of the same evidence relied on by the ALJ and agreed that any ambiguity that might have appeared in the policy's naming of Ellington as an "insured" was "remedied by the audit forms and the wording in the contract itself indicating Ellington, individually, was excluded from coverage and his salary was not included in calculating the premium due each year."

The Court of Appeals, however, reversed. The court noted, incorrectly, that the ALJ had found an ambiguity in the insurance policy and concluded that the ALJ erroneously construed the ambiguity against Ellington. Instead, the court reasoned, the ambiguity should be construed strictly against the drafter, KEMI. Reviewing the policy *de novo*, the court contrasted the exclusion endorsement with the named-insured endorsement to conclude that "the policy could reasonably be interpreted to exclude Ellington in his capacity as the business owner while including him under its coverage as its **sole employee**." The court also concluded that the ALJ's interpretation of the policy language was undermined by the reasonable-expectations doctrine under which insurance-policy ambiguities are resolved in favor of the insured's reasonable expectations.

The case comes to this Court as a matter of right appeal.

## II. Analysis

This case presents one overarching question: Was Randy Ellington entitled to benefits for his injury under the workers' compensation insurance policy issued to him by KEMI? To answer that question, we would ordinarily undertake a two-step analysis. First, we determine what the policy says and whether it includes any ambiguity. Second, if there is any ambiguity, we must resort to the standard tools of interpretation to determine what coverage the policy provides. In this case, the policy, by its clear language, excludes Ellington from coverage and contains no ambiguity. Thus, we resolve this case in the first step of the analysis. Nevertheless, to the extent there may be some remnant of ambiguity, we apply the traditional tools of contract interpretation and still conclude that the policy excludes Ellington from bodily-injury benefits.

Before turning to the policy itself, it is worth noting that the Court of Appeals was incorrect in claiming that the ALJ

found that the policy was ambiguous. What the ALJ found was that there *"may have been* some ambiguity," (emphasis added), but that the seeming ambiguity "should have been clarified" by the language of the exclusion endorsement. Though the ALJ used the normative language "should have," he was, in effect, concluding that there was no ambiguity.

 This seeming ambiguity in the ALJ's decision, however, ultimately does not matter. As the Court of Appeals correctly noted, interpretation of an insurance contract is a question of law. *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.,* 306 S.W.3d 69, 73 (Ky.2010). Appellate review, therefore, is *de novo,* and no deference is given to the decisions of lower tribunals, even as to the existence of an ambiguity.

 The language of the policy is clear. The exclusion endorsement specifically named Ellington, as the sole proprietor of R & J Cabinets, as excluded from coverage for bodily injury. It bears repeating: "The policy does not cover bodily injury to any person described in the Schedule." The only person "described in the Schedule" was "Randy Ellington," the "Sole Proprietor" of R & J Cabinets.

That Ellington was also named as an "insured" does not make this term ambiguous or otherwise create conflict in the policy. "Insured" means "[s]omeone who is covered or protected by an insurance policy." *Black's Law Dictionary* (10th ed.2014). In other words, he was entitled to some type of benefit from the policy. But that does not mean he was entitled to benefits for his injury. Even if he does not get paid for his injuries under the insurance contract, Ellington is still protected by it.

Many contracts of insurance offer two benefits or types of protection. The first

kind offsets the insured's liability to third parties. The second kind pays the insured for his own injuries. This is most often seen with automobile insurance, where there is liability coverage for damage done to third parties by the insured's vehicle, and collision (and PIP) coverage that pays for injuries to the insured and his vehicle. But a driver is not required to have both types of protection, and many opt to have only liability insurance.

Workers' compensation insurance, by its very nature, splits these two protections. By law, employers are required to maintain insurance (or be selfinsured) for the benefit of their employees. In a sense, this works like liability coverage, as it shields the employer by providing coverage for any liability claim the employee may have against the employer. (Of course, the benefit to the employee is actually greater than with standard insurance because the covered employer in workers' compensation does not have to be at fault for there to be a recovery.) But the legal default with workers' compensation insurance is that the owner of a business (the employer) is not entitled to workers' compensation benefits, whether they are paid under an insurance policy or from a selfinsurance fund. KRS 342.012(1). Instead, to receive such benefits, the owner must elect to be covered, id. and obtain a separate policy endorsement, KRS 342.012(2), which comes at an added cost.

At the very least, Ellington, as the owner of the business, received liability protection from his policy. If he chose to hire an employee, and the employee was injured, the policy would cover the ensuing liability (to the extent of the policy limits). Had Ellington not had insurance, he would be personally liable for the workers' compensation benefits owed to the employee. The employee would have no independent cause of action because workers' compen-

sation benefits are the exclusive remedy for on-the-job injuries when the employer has a workers' compensation insurance policy. *See* KRS 342.690.

Thus, there is no conflict, and no ambiguity, in the insurance policy. An owner-employer like Ellington can be both an insured (and thus receive liability protection from the policy) and yet be excluded from monetary benefits for bodily injury under the policy. That split in benefits is the default nature of workers' compensation insurance in Kentucky. The policy acknowledges this default split.

The Court of Appeals tried to find an ambiguity by contrasting the named-insured endorsement with the exclusion endorsement. From this contrast, the court concluded that "the policy could reasonably be interpreted to exclude Ellington in his capacity as the business owner while including him under its coverage as its sole employee." Although one source has described the sole proprietor as both the "owner and principal employee" of a sole proprietorship, 17 James Seiffert, *Ky. Prac. Corp. Law with Forms* § 1:2, for most purposes, "the individual proprietor is not treated as an employee of the business (as are those employed by him)," 4A William B. Bardenwerper et al., *Ky. Prac. Methods of Prac.* § 18:2. Indeed, this is why sole proprietors cannot take advantage of many tax deductions and similar benefits available to business entities like corporations. *Id.* Where such benefits extend to sole proprietors, it has come through legislative or regulatory action. *Cf.* 26 C.F.R. § 1.7476–1 (stating that "a sole proprietor shall be considered such person's own employer" for purposes of interested-party rules related to qualified retirement plans).

It is thus evident that the Court of Appeals' reading misunderstands the nature of a sole proprietorship. Unlike a corporation or a limited-liability company, a sole proprietorship is not an entity separate from the proprietor. They are one and the same. *Cf. Black's Law Dictionary* (10th ed.2014) (defining sole proprietorship as "[a] business in which one person owns all the assets, owes all the liabilities, and *operates in his or her personal capacity*" (emphasis added)). Though we often speak of such people as being self-employed, no one really contemplates that a sole proprietor acts in two capacities, both as employer and employee. The Court of Appeals' confusion appears to stem from the fact that Ellington operated his business under an assumed name, rather than his own, as is allowed under KRS 365.015. But again, that does mean that R & J Cabinets was a separate entity from Ellington. Rather, the use of the assumed name for the sole proprietorship further demonstrates that Ellington and the business were one and the same.[3]

Moreover, the Court of Appeals' reading would essentially render the exclusion superfluous. If Ellington was covered when acting as an "employee," i.e., when doing work, but excluded when "acting" as an owner, there is no need for the exclusion. The only time Ellington could conceivably be entitled to workers' compensation benefits would be if his injuries occurred on the job, that is, when he was acting as an employee. The policy exists only to pay benefits that a worker would be owed because of the workers' compensation law. Ellington's status as an owner exists at all times. Injuries that might happen to him when only that status was in effect, such

---

**3.** According to the ALJ, Ellington once operated the business with a partner, suggesting that the business was a general partnership at that time, but the partner had left the business at least six years before the accident in this case.

as after work hours, would not be subject to the workers' compensation law.

■ Despite the apparent clarity of the agreement, courts are nevertheless bound to look at an insured's reasonable expectations in deciding whether the insurance contract is ambiguous and what the contract means. *See Simon v. Continental Ins. Co.,* 724 S.W.2d 210, 212 (Ky.1986) ("An essential tool in deciding whether an insurance policy is ambiguous ... is the so-called 'doctrine of reasonable expectations.' "). But in applying the doctrine of reasonable expectations, even if there were some residual ambiguity in the insurance policy, we could not find that Ellington was entitled to benefits for his injury.

■ "The rule of interpretation known as the 'reasonable expectations doctrine' resolves an insurance policy ambiguity in favor of the insured's reasonable expectations." *Aetna Cas. & Sur. Co. v. Commonwealth,* 179 S.W.3d 830, 837 (Ky. 2005); *see also True v. Raines,* 99 S.W.3d 439, 443 (Ky.2003) ("[T]he reasonable expectation doctrine ... resolves an insurance-policy ambiguity in favor of the insured's reasonable expectation...."). The basic thrust of this doctrine is "that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy." *Simon,* 724 S.W.2d at 212 (quoting R.H. Long, *The Law of Liability Insurance* § 5.10B). Where a person has paid a premium for a policy, the policy should not be read technically to avoid paying benefits. *See Aetna Cas. & Sur. Co.,* 179 S.W.3d at 837 ("We believe 'an insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment.' " (quoting *Moore v. Commonwealth Life Ins. Co.,* 759 S.W.2d 598,

599 (Ky.App.1988))). "Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Simon,* 724 S.W.2d at 212 (quoting R.H. Long, *The Law of Liability Insurance* § 5.10B). This test looks to the reasonableness of what an insured may believe about coverage, and necessarily relies heavily on the facts.

This Court has also stated that the rule of *contra proferentem,* i.e., that an agreement is construed strictly against the drafter, should be used in interpreting insurance contracts. Indeed, we have specifically stated that "doctrine of reasonable expectations is used in conjunction with the principle that ambiguities should be resolved against the drafter," *Id.* at 213 (quoting R.H. Long, *The Law of Liability Insurance* § 5.10B). Although we have said that "Kentucky has consistently recognized that an ambiguous policy is to be construed against the drafter, and so as to effectuate the policy of indemnity," *Bituminous Cas. Corp. v. Kenway Contracting, Inc.,* 240 S.W.3d 633, 638 (Ky.2007), we have also said that "[t]he rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.,* 870 S.W.2d 223, 226 (Ky. 1994).

■ So what could Ellington have reasonably expected from the insurance policy he bought from KEMI? The reasonable expectations rule requires more than finding the existence of an ambiguity and, without considering the surrounding facts, ruling against the insurer. Nevertheless,

in deciding this case, the Court of Appeals did not give adequate consideration to the surrounding facts. Instead it based its decision to reverse merely on the existence of an ambiguity, finding that the Board and ALJ had misconstrued the law in light of the ambiguity. After considering the facts and circumstances of this case, including Ellington's application for the policy, his audits, and the language of the policy itself, this Court can only conclude that Ellington could not have reasonably expected to get benefits for his bodily injury.

First, Ellington's computer-generated application for the policy in 2006 stated that he was not "covered" by it.[4] In light of this fact, from the beginning, it was not reasonable for Ellington to expect to be paid benefits under the policy.

In the two years after obtaining the policy, Ellington filled out audit forms. These forms also stated that Ellington was not included in the policy's coverage. The forms also listed Ellington's employees and their salaries for the year.

At no time did Ellington report his personal income for use in calculating the premium, and Ellington testified that he understood that the premium would change based on his employees' payroll.[5] From this, Ellington certainly should have known that he was only paying for coverage for employees. In fact, the amount of his premiums changed over the first two years because of the differing number of employees.

All of this is evidence that at the time the policy was written, and as it renewed, Ellington clearly understood—or at least should have reasonably expected—that he was not covered for bodily injury under the policy.

That he really did not believe he was covered is highlighted by the fact that when he went to the hospital for his injury in 2010, he did not tell the hospital that he was covered by workers' compensation insurance. Instead, he called his lawyer from the hospital and thereafter directed inquiries about payment to the lawyer. This clearly does not sound like a person who believed he had insurance coverage.

Despite this proof, the Court of Appeals held that the ALJ and the Board misconstrued the controlling law of the reasonable-expectations and *contra proferentem* doctrines. But, in fact, neither the ALJ nor the Board misconstrued the law. The ALJ accurately applied it, which the Board recognized. Under the facts of this case, the ALJ determined that "it is not credible that the Plaintiff believed that he had worker's [sic] compensation coverage at the time of his injury *in light of the weight of the evidence to the contrary.*" (Emphasis added.) The ALJ considered all the facts surrounding the claim of ambiguity, and took into consideration the audit forms saying Ellington personally was not covered; the lower premiums he negotiated when his employee level changed; the vast difference between premiums for employee-only policies versus the premium if a principal is included; his failure to claim insurance coverage when he was admitted

---

4. Another form filled out around that time by the underwriter included the question, "Any owners/officers *included* in coverage?" The space after this was left blank. It is not clear whether Ellington saw this form.

5. The ALJ noted several phone records showing that Ellington reported changes in the

number of employees he had when renewing his policy, which affected the amount of premium to be paid. The Board noted that this evidence was submitted after the evidence had been closed and thus was improperly considered.

to the hospital; and various other factors that came from examining the insurance documents over the entire coverage period. The Board could not say, nor can we, that the evidence did not support the ALJ's conclusion that Ellington did not believe he had coverage under this policy. Certainly, if the evidence shows Ellington did not actually believe he had coverage, he could not have "reasonably believed" that he did.

Finally, counsel for Ellington argued to the ALJ that an unpublished decision of this Court, *Kentucky Employers' Mutual Insurance v. Decker*, 2010–SC–000459–WC, 2011 WL 1642183 (Ky. Apr. 21, 2011), supported his position. As an unpublished opinion, it can have at most a persuasive effect and is not binding.

As importantly, the opinion does not support Ellington's position. In fact, in *Decker* this Court clearly stated that "[a]lthough a court must enforce an *unambiguous* contract strictly, according to the ordinary meaning of its terms and without resort to extrinsic evidence, the court *may* consider extrinsic evidence when interpreting an ambiguous contract." *Id.* at *6 (citations omitted, emphasis added). This standard was morphed by the Court of Appeals in this case into the statement that the Board misconstrued the law because it did not "interpret the exclusion contained in KEMI's policy strictly against the insurer."

But in applying the reasonable expectations doctrine, a tribunal considers all the circumstance surrounding the policy, including extrinsic evidence, in interpreting the effect of the ambiguity in the policy. The extrinsic evidence—the facts—in this case, though superficially similar, are actually quite different than those in *Decker*. Here, the policy listed the company name, not just Ellington's name alone, as Decker's policy did. Ellington listed employees, where Decker did not. Decker

claimed only one employee—himself. Ellington had a high school education with some further vocational education, and could read and understand the policy and subsequent audit forms. Decker, however, completed only the ninth grade, could only read some of the policy, and no audit forms were introduced. Decker made a workers' compensation claim immediately after his accident, and Ellington did not.

There was also a complicated fact pattern about why and how Decker obtained the insurance, and at least one significant difference in the language of the policy—a statement on the named-insured endorsement that the "'Named Insured' . . . was 'included in policy coverage.'" *Id.* at *3. The named-insured endorsement on Ellington's policy included no such language. In short, the facts demonstrated that Decker had been led to believe he had appropriate coverage and that he always believed he did. But the facts in this case compel a different conclusion.

## III. Conclusion

As explained above, Ellington was excluded from benefits for bodily injury occurring on the job under the workers' compensation insurance policy he purchased from KEMI. For that reason, the judgment of the Court of Appeals is reversed, and the order of the Board affirming the decision of the ALJ is reinstated.

All sitting. All concur.