RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

WILD EGGS HOLDINGS, INC.; WILD EGGS OPERATIONS, LLC; WILD EGGS FRANCHISING, LLC,

　　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY,

　　　　　　　　　　*Defendant-Appellee*.

⎫
⎜
⎜
⎜
⎬　No. 21-5962
⎜
⎜
⎜
⎭

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:20-cv-00501—Rebecca Grady Jennings, District Judge.

Argued:  June 9, 2022

Decided and Filed:  September 9, 2022

Before:  BOGGS, MOORE, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellants.  Adam H. Fleischer, BATESCAREY LLP, Chicago, Illinois, for Appellee.  **ON BRIEF:**  Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellants.  Adam H. Fleischer, Michael H. Passman, BATESCAREY LLP, Chicago, Illinois, for Appellee.  Christopher E. Kozak, PLEWS SHADLEY RACHER & BRAUN, LLP, Indianapolis, Indiana, Edward M. O'Brien, Andrew-John Bokeno, WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Louisville, Kentucky, for Amici Curiae.

　　　GRIFFIN, J., delivered the opinion of the court in which BOGGS, J., joined.  MOORE, J. (pp. 12–15), delivered a separate dissenting opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

At the beginning of the COVID-19 pandemic, Indiana, Ohio, and Kentucky suspended in-person, "non-essential" business through respective "Stay at Home" orders. So plaintiff Wild Eggs[1] halted dine-in operations at its restaurants in those states and then sought insurance coverage for lost revenue from defendant State Auto Property and Casualty Insurance Company. Wild Eggs claims in this lawsuit that State Auto breached the parties' insurance contract when it denied coverage. The district court granted State Auto's motion to dismiss, concluding that Wild Eggs had failed to state a claim upon which relief could be granted. We affirm.

I.

Wild Eggs owns and operates a chain of breakfast and lunch restaurants. When the COVID-19 pandemic began in March 2020, the states in which Wild Eggs does business imposed Stay at Home orders for all "non-essential" businesses. Kentucky prohibited "[a]ll in-person retail businesses that are not life-sustaining." The same was true in Indiana and Ohio. The orders dramatically affected Wild Eggs's operations—it was forced to suspend in-person dining and to restrict restaurant use to curbside pickup and delivery.

State Auto has insured Wild Eggs since 2016. Wild Eggs notified State Auto of its claim for business losses under two provisions of note. First, it claimed coverage under the Restaurant Extension Endorsement (the "Endorsement"), which provides for 30 days of lost business income for the suspension of restaurant operations due to the order of a civil authority that resulted from an actual or alleged exposure of a restaurant to a disease. Second, it claimed coverage for all lost business income resulting from "direct physical loss of or damage to property" under the "Business Income Coverage" provision. State Auto denied coverage, and Wild Eggs subsequently filed this breach-of-contract suit.

---

[1]Although separate entities, we refer to plaintiffs as Wild Eggs singularly for ease.

Contending that neither the Business Income Coverage provision nor the Endorsement provided coverage, State Auto filed a motion to dismiss.  The district court granted the motion, agreeing with State Auto that (1) the Endorsement did not apply because the closures of Wild Eggs's restaurants did not result from an exposure to COVID-19 at the restaurants themselves; and (2) the Business Income Coverage provision did not apply because Wild Eggs did not suffer tangible damage to its property.

Wild Eggs now appeals.

## II.

We review de novo a district court's decision on a motion to dismiss.  *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 402 (6th Cir. 2022).  The complaint is construed in the light most favorable to the plaintiffs, but it must contain "enough facts to state a claim to relief that is plausible on its face."  *Phillips v. DeWine*, 841 F.3d 405, 413–14 (6th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Kentucky law governs this case.[2]  A court sitting in diversity must apply "the law of the state's highest court."  *Brown Jug*, 27 F.4th at 402 (citation omitted).  "In Kentucky, the proper meaning of a disputed contract term presents a legal question for the court."  *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 699 (6th Cir. 2022) (citing *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021)).  Kentucky courts "apply certain rules of construction to insurance contracts, including a rule that when the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced as written."  *Foreman*, 617 S.W.3d at 349.  Unambiguous terms are interpreted "in the light of usage and understanding of the average person," while ambiguous terms are "strictly construed against the insurer so as not to defeat the policyholder's reasonable expectation of coverage."  *Id.* at 349–50 (citation omitted).  But the rule of strict construction "does not mean that every doubt must be resolved against the insurer and does not interfere with the rule that the policy must receive a reasonable interpretation

---

[2]The policy here was issued in Kentucky through a Kentucky broker, and it covers more locations in Kentucky than in either Ohio or Indiana.  Thus, Kentucky has the "most significant relationship" to the policy.  *See Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566–67 (Ky. 2012).

consistent with the plain meaning in the contract." *Id*. at 350 (citation omitted). Rather, we "consider what could be reasonably expected by the insured from the plain contract language, as it is controlling." *Id*.

### III.

Wild Eggs first argues that it stated a claim for breach of contract under the Endorsement. The Endorsement states, in pertinent part:

**1.** The Causes of Loss applicable to the Business Income Form attached to this policy shall also include the following:

**a.** The "suspension" of your "operations" at the described premises due to the order of a civil authority; or adverse public communications or media reports, resulting from the actual or alleged:

\* \* \*

**(2)** Exposure of the described premises to a contagious or infectious disease.

In the policy, the "described premises" are Wild Eggs's restaurants. "Suspension" is defined as "[t]he slowdown or cessation of your business activities." "Operations" means Wild Eggs's "business activities occurring at the described premises." Read together, the Endorsement requires a suspension of restaurant operations due to an order of civil authority that results from an alleged exposure of the restaurant to a disease.

Because it is undisputed that Wild Eggs's restaurants were shut due to orders of civil authorities, the issue in question is whether Wild Eggs can satisfy the Endorsement's required causal connections, that the suspension "due" to civil authority must "result[] from" an "alleged exposure" to a disease. Wild Eggs focuses on the phrase "alleged exposure." It argues that, because the policy explicitly describes that the exposure can be merely "alleged," it need not show an "actual" exposure. Wild Eggs therefore notes that the mere possibility or allegation that COVID-19 was at the restaurant in March 2020 satisfies the policy's language. But regardless of whether Wild Eggs has sufficiently pleaded an "alleged exposure," Wild Eggs interpretation still falls short by failing to give full effect to the "resulting from" language.

The suspension first must be "due to" the order of civil authority. Because the policy does not define this term, we turn to dictionary definitions to define it (and others, below). *See, e.g.*, *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 838 (Ky. 2005).[3] "Due," as an adjective, is defined as "[t]hat is owed, appropriate, allotted, or attributable to someone or something,"[4] or "capable of being attributed: ASCRIBABLE."[5] This means that the suspension must be owed, ascribed, or attributed to the order. In other words, the only suspensions that may be covered are those caused by orders of civil authority.

Next, the subsequent "resulting from" phrase then creates a causal relationship between the civil-authority-induced suspension and the alleged exposure. "Result," as an intransitive verb, is defined as "[t]o arise as a consequence, effect, or outcome of some action, process, or design; to occur as a result *to*; to end or conclude *in* a specified manner,"[6] or "to proceed or arise as a consequence, effect, or conclusion . . . death *resulted* from the disease."[7] Thus, the suspension must arise as a consequence, effect, outcome, or conclusion from the alleged exposure. The context and syntax of the sentence—where "alleged exposure" follows the "suspension" and "order"—demonstrates that the "alleged exposure" must cause not only the suspension, but also the order producing the suspension. That is, the suspension must be "due to," or attributed to, the order, which must "result[] from," or be caused by, the exposure. The policy contemplates a singular line of causation—the exposure causes the order, which in turn causes the suspension. Any other interpretation, such as that advanced by Wild Eggs, would incorrectly decouple the causal relationship between the order and the alleged exposure.

---

[3]Consulting several dictionaries contemporaneous to or published shortly after the policy language applies is a best practice. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 417–19 (Thompson/West 2012). The policy here was entered into in April 2019. For that reason, we use current online dictionaries.

[4]*Due*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/58238?rskey=XvFtdb&result =2&isAdvanced=false#eid (last accessed August 3, 2022).

[5]*Due*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/due (last accessed August 3, 2022).

[6]*Result*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/ 164062?rskey=tGTcrE&result=2&isAdvanced=false#eid (last visited August 3, 2022).

[7]*Result*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/resulting (last accessed August 3, 2022).

Because the "alleged exposure" must cause the "suspension . . . due to the order of a civil authority," the alleged COVID-19 exposure must cause both the order and the resulting suspension. But here, the proper order is reversed: the States responded to a large-scale threat of disease by mandating that restaurants (and other non-essential businesses) close to *prevent* exposure. The Stay at Home orders were prophylactic measures intended to curb generally the spread of COVID-19 statewide, not to respond to an exposure of Wild Eggs's restaurants. The Kentucky order, for example, cited the national public-health emergency, the general severity of the COVID-19 disease, and the need to prepare for a public-health emergency in the state. There is no mention of an exposure at Wild Eggs's restaurants. The same concerns prompted the Indiana and Ohio orders. For that reason, no causal relationship exists. Here, the suspension of Wild Eggs's operations was not due to an order that itself arose as an outcome or effect of an alleged exposure of a restaurant.

This conclusion does not change even though Wild Eggs alleged actual exposures of certain restaurants in the form of positive COVID-19 tests for some employees. In its amended complaint, Wild Eggs noted several closures in August 2020 due to employees' positive COVID-19 tests, even after the restaurants opened for limited dine-in operations. But those positive tests did not create the Stay at Home orders that caused Wild Eggs to close; and how could they have? Wild Eggs alleges that those positive tests occurred *after* the original Stay at Home orders were lifted or modified to provide limited in-person dining. Positive tests in August 2020 could not have been the cause of the Stay at Home orders issued in March 2020. At most, those positive tests were the effect that the orders were intended to prevent. And those exposure-induced closures could not have given rise to coverage under this policy because they occurred after the policy expired in April 2020. *See* 14 Steven Plitt et al., *Couch on Insurance* § 201:4 (3d ed. Dec. 2021 update) ("[W]here the claims made against an insured fall outside the policy's period, the insurer should not be called to foot the bill for ex-policyholders in their attempt to extend coverage.").

Kentucky courts would reach this same conclusion. They would rely on close readings of dictionary definitions, and those definitions here support State Auto's interpretation that the suspension did not arise from an alleged exposure. *See, e.g.*, *Aetna Cas. & Sur. Co.*, 179 S.W.3d

at 838. Additionally, in certain circumstances, Kentucky courts have also looked to the treatise *Couch on Insurance*. *See, e.g.*, *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 683 (Ky. 2012). *Couch* notes that "resulting from" language in an insurance policy generally means "flowing from" or "having its origin in" something. 7 *Couch on Insurance* § 101:52. Though this phrase "does not require a direct proximate causal connection," it does necessitate "some causal relation or connection." *Id*. Application of this treatise provision here supports our conclusion that the policy requires a causal connection between the suspension, order, and exposure, and that no such connection exists. The civil authority orders and suspension did not "hav[e] [their] origin in" an exposure at Wild Eggs's restaurants but in a general statewide concern for the spread of COVID-19.

Our conclusion does not stand alone. In *Terry Black's Barbecue, L.L.C. v. State Automobile Mutual Insurance Co.*, the Fifth Circuit, interpreting identical language, held that the civil-authority orders did not result from a restaurant's exposure to COVID-19 and, thus, there was no coverage. 22 F.4th 450, 458 (5th Cir. 2022). "Resulting from" requires causation, and, in *Terry Black's Barbecue*, the insured "failed to allege even a remote causal relationship between the civil authority orders and its restaurants' alleged or actual exposure to COVID-19." *Id*. This was true from a "common sense" perspective of the pandemic: "The civil authority orders 'resulted from' the global pandemic and the need to take measures to contain and prevent the spread of COVID-19. The language in the orders indicates that they were enacted to *avoid* exposure to COVID-19, not *because of* exposure to COVID-19." *Id*. at 458–59. The same is true here, and Kentucky courts would find this on-point analysis persuasive. *See, e.g.*, *Wehr*, 384 S.W.3d at 683–87 (considering out-of-state caselaw).

Wild Eggs argues it should still prevail because the policy is ambiguous and, thus, should be construed against State Auto in Wild Eggs's favor. But for the reasons discussed above, the policy language is not ambiguous, and Wild Eggs's interpretation is unmoored from the plain language of the policy. This too renders inapplicable the doctrine of *contra proferentem*, i.e., that an agreement is construed against the drafter. *See Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007) ("[A]n *ambiguous* policy is to be construed against the drafter, and so as to effectuate the policy of indemnity." (emphasis added)). Because

there is no ambiguity, we cannot construe the material phrase against State Auto (the drafter), and instead must look only to its plain and ordinary meaning. *See Foreman*, 617 S.W.3d at 350.

Finally, Wild Eggs argues (and the dissent accepts) that the reasonable-expectations doctrine triggers coverage. In Kentucky, "courts are nevertheless bound to look at an insured's reasonable expectations in deciding whether the insurance contract is ambiguous and what the contract means." *Ky. Emps.' Mut. Ins. v. Ellington*, 459 S.W.3d 876, 883 (Ky. 2015). Wild Eggs argues that this description from *Ellington* requires us to consider reasonable expectations *before* a finding of ambiguity, but *Ellington* did not hold as such. Rather, it reaffirmed the longstanding Kentucky rule that "the 'reasonable expectations doctrine' resolves an insurance policy *ambiguity* in favor of the insured's reasonable expectations." *Id*. (emphasis added) (quoting *Aetna Cas. & Sur. Co.*, 179 S.W.3d at 837). *See also True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003) (noting that the reasonable expectations doctrine "applies only to policies with ambiguous terms"). *Ellington* also clarified that, while unequivocal language may exclude coverage, the opposite finding, i.e., an ambiguity in a policy, is not enough by itself to provide coverage—rather, the doctrine considers the underlying facts and "looks to the reasonableness of what an insured may believe about coverage." *Ellington*, 459 S.W.3d at 883. Applying this test, *Ellington* noted that an ambiguity existed in the policy at issue but that the insured still could not have reasonably expected coverage given the surrounding facts. *Id*. at 883–84. *Ellington* demonstrates that here, contrary to Wild Eggs's and the dissent's arguments, the reasonable-expectations doctrine does not provide coverage. No ambiguity exists, meaning that it would not be reasonable for Wild Eggs to expect coverage under the policy here.[8] The suspension was not due to an order that resulted from an alleged exposure.

For these reasons, no coverage exists under the Endorsement. It does not provide coverage for general preventative measures that impacted Wild Eggs's operations, but for orders that responded to alleged exposures of Wild Eggs's restaurants. No exposure caused the orders,

---

[8]While we recognize that the reasonable expectations doctrine requires an "unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage" to defeat a reasonable expectation, *see Ellington*, 459 S.W.3d at 883, we emphasize that this case involves a coverage provision, not one excluding coverage. We conclude that such an unequivocal intent exists here given the lack of ambiguity in the Endorsement.

meaning that the Endorsement does not apply. Therefore, Wild Eggs is not entitled to coverage, and its complaint stating otherwise failed to state a claim upon which relief could be granted.

IV.

Wild Eggs argues that, even if it does not prevail on its Endorsement contention, it could still recover under the Business Income Coverage provision. That provision states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

The definitions of suspension and operations are the same as for the Endorsement. The "period of restoration" is the time that begins "72 hours after the time of direct physical loss or damage for Business Income Coverage" or "[i]mmediately after the time of direct physical loss or damage for Extra Expense Coverage . . . caused by or resulting from any Covered Cause of Loss at the described premises." That period ends when either the property should be "repaired, rebuilt or replaced with reasonable speed and similar quality" or when "business is resumed at a new permanent location."

We have already addressed how Kentucky courts have interpreted the phrase "direct physical loss" in the context of COVID-19 Stay at Home orders, holding that business-income losses resulting from those orders did not constitute such a loss. *Estes*, 23 F.4th at 699–700. "The phrase 'physical loss' would convey to the 'average person' that a property owner has been tangibly deprived of the property or that the property has been tangibly destroyed." *Id*. at 700 (citation omitted). Thus, because "neither the pandemic nor the government shutdown orders caused a 'direct' 'physical loss'" to the insured's property, the policy did not provide coverage. *Id*. at 702.

*Estes* governs our interpretation of the phrase "direct physical loss" under Kentucky law. To the extent that this case turns on that phrase, the panel is bound by the prior decision. *See Salmi v. Sec'y of Health and Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). Thus, unless the

insurance policy here justifies a departure from *Estes*, we must follow that case. *Cf. Wilkerson v. Am. Fam. Ins. Co.*, 997 F.3d 666, 669–70 (6th Cir. 2021) (noting that different policies may interpret terms in different ways). And nothing in the insurance policy justifies a different result than in *Estes*.

For one, the policy language between the two cases is materially identical. The *Estes* policy provided coverage for "direct loss," defining "loss" as "accidental physical loss or accidental physical damage." 23 F.4th at 698. Though 'accidental' is not present in the policy here, the language here is otherwise the same. And the context of the two policies confirms that the phrase carries the same meaning. Like the policy in *Estes*, the Business Income Coverage provision permits an insured to recover income for business suspensions only during the "period of restoration"—a defined period that ends when the property should have been "repaired, rebuilt or replaced with reasonable speed and similar quality[.]" The phrase "repaired, rebuilt, or replaced" contemplates some tangible or physical problem at the property that requires fixing. Without such a physical problem that required a tangible repair, there is no "period of restoration." *Cf. Estes*, 23 F.4th at 700–01.

Wild Eggs's other contentions similarly fail to identify anything that would justify a different result than in *Estes*. To get around *Estes*, Wild Eggs argues that it did not suffer only "direct physical loss" as in *Estes*, but also "direct physical . . . damage." It states that microscopic damage occurred to its restaurants from COVID-19 exposure, thereby closing its restaurants. It is true that *Estes* focused on the "loss" aspect, but much of its analysis turned on the requirement that the harm be "physical," which applied to both "loss" and "damage." *Cf. Estes*, 23 F.4th at 701 ("Estes's reading . . . fails to explain how its reading gives any effect to the word 'physical' in the phrase 'physical loss.'"). But to the extent *Estes*'s holding does not apply to "damage," we conclude that Wild Eggs could not have suffered "direct physical . . . damage." "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation."[9] Here, it too is modified by "physical," contemplating some tangible loss, harm, or injury. And the policy requires that this physical, tangible damage be to "property." After the

---

[9]*Damage*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/damage (last accessed August 3, 2022).

beginning of the pandemic when Wild Eggs lost partial use of its property, Wild Eggs still had all its property without any of it being harmed—it simply could not *use* it as it wished. This is neither a physical loss of nor physical damage to property.

The Kentucky cases cited by Wild Eggs—*State Farm Fire & Cas. Co. v. Aulick*, 781 S.W.2d 531 (Ky. Ct. App. 1989), and *Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. 11-16-DLB-EBA, 2013 WL 4400516 (E.D. Ky. Aug. 14, 2013)—do not warrant a different conclusion. Both involved tangible losses of property. *Aulick* addressed odor damage from an oil spill, but odor damage is still a tangible property loss. *See Estes*, 23 F.4th at 702 (distinguishing *Aulick* for that reason). And *Ashland* addressed a data storage network's loss of reliability due to heat exposure, another tangible harm. 2013 WL 4400516, at *4–5. Here, by contrast, COVID-19 did not alter or harm the restaurants in a perceptible way; instead, the Stay at Home orders caused Wild Eggs to lose in part its ability to use the property.

Wild Eggs concludes its arguments by again raising its ambiguity and reasonable expectations position. But, as with the Endorsement, the policy is not ambiguous. It requires tangible harm and damage to the property, but no such damage occurred here. Wild Eggs simply lost its preferred use of its properties and incurred no property damage. For this reason, the policy is not ambiguous, and, thus, reasonable expectations do not apply here either. *Bituminous*, 240 S.W.3d at 638; *Ellington*, 459 S.W.3d at 883.

In sum, no coverage exists under the Business Income Coverage provision. Wild Eggs never incurred "direct physical loss of or damage to [its] property." Rather, it lost its use of its property from Stay at Home orders. Thus, as in *Estes*, the policy does not provide coverage.

V.

For these reasons, we affirm the judgment of the district court.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  In March 2020, in response to the COVID-19 pandemic, state and local governments across the country issued shutdown orders that required nonessential businesses to close.  Wild Eggs was among the impacted businesses and, due to the public-health orders, it shuttered its restaurants during the early months of the pandemic.

Shortly after closing, Wild Eggs filed an insurance claim.  Its insurer, State Auto, denied the claim.  Although the majority holds that State Auto's denial of the claim was proper, I respectfully disagree.  Instead, I would hold that the insurance contract covers Wild Eggs's losses.

When determining whether an insurance policy provides coverage, Kentucky law provides for a two-step analysis.  "First, we determine what the policy says and whether it includes any ambiguity."  *Ky. Emps. Mut. Ins. v. Ellington*, 459 S.W.3d 876, 880 (Ky. 2015).  "Second, if there is any ambiguity, we must resort to the standard tools of interpretation to determine what coverage the policy provides."  *Id.*  Under Kentucky law, "a court will interpret the contract's terms by assigning language its ordinary meaning."  *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).

Because this is an insurance contract, the doctrine of reasonable expectations shapes our analysis.  "[T]he gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy.  Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation."  *Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 589 (Ky. 2012) (quoting *Simon v. Cont'l Ins. Co.*, 724 S.W.2d 210, 213 (Ky. 1986)).  "Where a person has paid a premium for a policy, the policy should not be read technically to avoid paying benefits."  *Ellington*, 459 S.W.3d at 883.  "This test looks to the reasonableness of what an insured may believe about coverage, and necessarily relies heavily on the facts."  *Id.*

Significantly, the doctrine of reasonable expectations impacts both parts of the two-step analysis governing the interpretation of insurance contracts. First, the doctrine of reasonable expectations is "[a]n essential tool in deciding whether an insurance policy is ambiguous." *Bidwell*, 367 S.W.3d at 589 (quoting *Simon*, 724 S.W.2d at 212). Second, if there is an ambiguity: the doctrine "resolves [that] ambiguity in favor of the insured's reasonable expectations." *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 837 (Ky. 2005). This latter step is also sometimes called the doctrine of ambiguity: if policy language is ambiguous, the construction "most favorable to the insured must be adopted." *Woodson v. Manhattan Life Ins. Co. of N.Y.*, 743 S.W.2d 835, 838–39 (Ky. 1987) (quoting *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984)).

The key provision at issue here is the policy's "Restaurant Extension Endorsement." This provision covers losses due to "[t]he 'suspension' of your 'operations' at the described premises due to the order of a civil authority . . . resulting from the actual or alleged . . . [e]xposure of the described premises to a contagious or infectious disease. R. 28-1 (Insurance Policy at 104–05) (Page ID #1304–05). I agree with the majority that, for the provision to apply, a business must shut down "due to" a government order, which, in turn, must have "result[ed] from" exposure of the premises to an infectious disease.

"Exposure" has a range of meanings. Its meanings include "the state or fact of being subjected, *to* any external influence,"[1] and "the condition of being subject to some effect or influence."[2] All businesses, including Wild Eggs, were subjected to the external influence of COVID-19, a pandemic that raged throughout the country and was transmitted through the air. Wild Eggs was thus exposed to COVID-19, regardless of whether any specific individual contracted COVID-19 at the facility.

---

[1]*Exposure*, Oxford English Dictionary Online (3d ed. 2021), https://www.oed.com/view/Entry/66730?rskey=22IgQ8&result=1&isAdvanced=false#eid (last accessed August 10, 2022).

[2]*Exposure*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/exposure (last accessed August 10, 2022).

Recognizing this meaning of "exposure," I would apply the doctrine of reasonable expectations to hold that the policy's Restaurant Extension Endorsement provision is ambiguous. State Auto argues that this language requires that a specific occurrence *at* the covered premises directly cause the government order that forces the business to shut down. The language could bear that meaning. But the provision could also mean something more general, requiring only that the civil authority order shuts down businesses because *all* businesses—including the covered establishment—are exposed to a disease. Put differently, the language could apply when the government shuts down all businesses—including Wild Eggs—because all businesses—including Wild Eggs—are exposed to COVID-19.

The majority emphasizes that the order must "result[] from" the exposure. Maj. Op. at 5. The Fifth Circuit focused on this same language in *Terry Black's Barbecue, L.L.C. v. State Automobile Mutual Insurance Co.*, 22 F.4th 450, 458–59 (5th Cir. 2022), a case that analyzed the same policy language based on Texas state law. In the view of the majority (and the Fifth Circuit), the "resulting from" language requires causation. *Id.* at 458–59. I agree that causation is required. However, the causation requirement does not resolve the fundamental issue in this case, which pertains to the degree of specificity required. In other words, must the government order have been caused by the fact that *this specific premises* was exposed to a disease, or may the government order have been caused by the fact that all premises—*including this one*—were exposed to a disease? Either reading could be correct.

The majority reasons that because the public health orders were preventative, they could not have resulted from exposure to COVID-19. Maj. Op. at 6. But these preventative measures stemmed from the COVID-19 exposure that businesses faced. The public-health order reasoned that confirmed cases of COVID-19 existed "throughout the United States," and that COVID-19 "can easily spread from person to person." R. 28-2 (Executive Order at 1) (Page ID #1376). People and places were exposed to COVID-19, and the public health order intended to prevent future infection (and future exposure). In other words, the order's goal of preventing future exposure is entirely consistent with Wild Eggs's understanding that the order "result[ed] from . . . the exposure of" businesses (including Wild Eggs) to COVID-19.

Both Wild Eggs and State Auto offer reasonable interpretations of the contract language. Wild Eggs prevails unless there is "an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage." *Bidwell*, 367 S.W.3d at 589 (quoting *Simon*, 724 S.W.2d at 212). Because I believe that the contract contains no unequivocal, plain, or clear manifestation of the intent to exclude coverage, I respectfully dissent.