RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

PHOENIX INSURANCE COMPANY; TRAVELERS
PROPERTY CASUALTY COMPANY OF AMERICA; ST.
PAUL SURPLUS LINES INSURANCE COMPANY,

          *Plaintiffs-Appellees*,

     *v.*

WEHR CONSTRUCTORS, INC.,

          *Defendant-Appellant*.

> No. 24-5325

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:22-cv-00007—Karen K. Caldwell, District Judge.

Argued:  February 12, 2025

Decided and Filed:  April 18, 2025

Before:  GILMAN, STRANCH, and LARSEN, Circuit Judges.

─────────────

### COUNSEL

**ARGUED:**  Mark A. Boyle, BOYLE, LEONARD & ANDERSON, P.A., Fort Myers, Florida, for Appellant.  Michael D. Risley, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellees.  **ON BRIEF:**  Mark A. Boyle, Thomas E. Shepard, BOYLE, LEONARD & ANDERSON, P.A., Fort Myers, Florida, for Appellant.  Michael D. Risley, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellees.

─────────────

### OPINION

─────────────

RONALD LEE GILMAN, Circuit Judge.  Wehr Constructors, Inc. (Wehr) breached an agreement to build an addition to the St. Claire Medical Center (St. Claire) in Morehead,

Kentucky. In response, St. Claire sued Travelers Casualty and Surety Company (Travelers Surety), Wehr's performance-bond carrier, and Travelers Surety in turn brought in Wehr as a party to the litigation.

Wehr appeals the district court's ruling that none of Wehr's three insurers (Phoenix, St. Paul, and Travelers Property) had a duty to defend Wehr in that lawsuit. For the reasons set forth below, we **AFFIRM** the district court's decision regarding St. Paul, but **REVERSE** its decision regarding Phoenix, **VACATE** its decision regarding Travelers Property, and **REMAND** for further proceedings as to these latter two insurers.

## I.          BACKGROUND

### A.          The Wehr-St. Claire Agreement

In April 2016, Wehr entered into a contract with St. Claire to construct a Medical Services Pavilion as an addition to St. Claire's main hospital facility. Wehr and St. Claire set forth their agreement in a standard form issued by the American Institute of Architects (AIA) known as AIA document form A101-1997. The form is titled: "Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM." Section 14.2 of the Standard Form contains a termination clause that allowed St. Claire to terminate the contract if Wehr committed a "substantial breach," provided that the architect on the project certified that sufficient cause exists (the Termination Clause). If St. Claire invoked the Termination Clause, Wehr would not be entitled to the remaining unpaid balance of the contract, and St. Claire could seek damages from Wehr under § 14.2.4 if the cost of completing the project exceeded the unpaid balance.

In compliance with the Construction Agreement, Wehr secured a performance bond for the project from Travelers Surety. The bond obligated Travelers Surety to complete the project if Wehr failed to satisfactorily perform under the Construction Agreement. Under Kentucky law, Travelers Surety could recover from Wehr any amount that Travelers Surety paid to satisfy Wehr's liability or debts on the project. *See* Ky. Rev. Stat. Ann. § 412.080 (West 2024).

**B.      Wehr's breach and St. Claire's termination**

St. Claire claimed that Wehr failed to perform under the Construction Agreement. Among other things, Wehr missed deadlines, neglected to complete required inspections, and failed to properly supervise the subcontractors on the project.  All of this resulted in serious defects to the building's façade, air and moisture barrier, floor tiling, and fire-stopping mechanism.  St. Clair alleged that, "as a result of water condensation throughout" the project, "mold conditions permeate the entire facility, endangering the health of patients and staff."

Pursuant to the Termination Clause, St. Claire requested that the project architect certify that Wehr had substantially breached the Construction Agreement.  After the architect performed an investigation, he issued a final report in January 2019 (the Architect Letter).  The architect, in his letter, concluded that

> [Wehr] has consistently demonstrated through failure to act, failure to complete, and failure to resolve, that it is unwilling or unable to correct the defects and deficiencies at this project for [St. Claire]. . . .  Accordingly, . . . we do hereby certify that [Wehr] is 'guilty of a substantial breach' of the [Construction Agreement] under [the Termination Clause] and that sufficient cause exists to justify termination of the [Construction Agreement] should [St. Claire] wish to do so.

The Architect Letter also stated that St. Claire was entitled to withhold the remaining $2.2 million balance of the contract and that, between the likely damages and unpaid liens on the project, "this could be a $10+ million problem."

Later that same month, St. Claire sent Wehr's attorney a letter to terminate the Construction Agreement (the Termination Letter).  The Letter read:

> Based on the Architect's certification of the multiple breaches of contract by Wehr Constructors, we are hereby providing notice that St. Claire Regional Medical Center is terminating its Medical Services Pavilion Construction Agreement executed by Wehr Constructors, Inc. on April 20, 2016, pursuant to the Termination For Cause provisions of Article 14.2 of the General Conditions of the Contract.
>
> It is the intention of St. Claire to cooperate with [Travelers Surety] to finalize construction in accordance with contract expectations in the most economical fashion possible consistent with industry standards of construction. To this end, St. Claire, or more likely [Travelers Surety], may seek to employ the services of

Wehr's former subcontractors and sub-subcontractors. Since this is contemplated by terms of the terminated contract, we request that you inform your client of St. Claire's intent and its right to do so by the terms of the contract.

**C.     The insurance policies**

Upon receipt of the Termination Letter, Wehr requested coverage under three insurance policies that it carried with three different entities (collectively, the Insurers): (1) a general-commercial-liability policy from Phoenix Insurance Company (Phoenix), (2) a professional-liability policy from St. Paul Surplus Lines Insurance Company (St. Paul), and (3) an "umbrella" excess policy from Travelers Property Casualty Company of America (Travelers Property). All of these are entities of Travelers Companies, Inc.

Summarized below are the relevant terms of the Phoenix and St. Paul policies. The relevant terms of the Travelers Property policy mirror those of the Phoenix policy.

   *i.     Phoenix*

The Phoenix policy required Phoenix to pay Wehr "those sums that [Wehr] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." "Bodily injury or property damage" to which the insurance applies must have been caused by an "occurrence," which in turn is defined in the policy as an "accident." Phoenix also had a "duty to defend [Wehr] against any 'suit' seeking those damages." "Suit" is defined by the Phoenix policy as a "civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."

   *ii.     St. Paul*

Wehr's policy with St. Paul covered any "loss" that Wehr was legally obligated to pay if the loss was "caused by an act, error or omission to which th[e] insurance applie[d]." As relevant here, the policy defines "loss" as compensatory, punitive, or exemplary damages. That loss must have resulted from the "named insured's contractor professional services," which the policy defines in relevant part as "[c]onstruction management services if the 'named insured' has specifically agreed in a written contract to perform in the capacity of a construction manager."

St. Paul also had a duty to defend Wehr against any "claim" for loss to which the insurance applied. "Claim" is defined as "a written demand alleging liability on the part of the 'insured' for 'loss' caused by an act, error or omission."

**D.     St. Claire's suit**

In March 2019, St. Claire sued Travelers Surety to enforce Travelers Surety's obligations under Wehr's performance bond. St. Claire did not name Wehr as a defendant in the suit and did not seek any relief from Wehr.

Later that year, Travelers Surety sought leave to add Wehr as a party to the lawsuit. But Travelers Surety did not bring a claim against Wehr, which it could have done by adding Wehr as a third-party defendant under Rule 14 of the Federal Rules of Civil Procedure. Instead, Travelers Surety moved to permissively join Wehr as a party under Rule 20(a)(2) of the Federal Rules of Civil Procedure, explaining that "[w]hether Travelers is obligated to perform under the bond is strictly dependent on whether Wehr breached [the Construction Agreement]. . . . [T]his court will of necessity need to evaluate and interpret the underlying general contract between St. Claire and Wehr, the alleged breach thereof, [and] whether and to what extent the performance bond issued by Travelers comes into play."

The district court granted Travelers Surety's motion over St. Claire's objection. Wehr then filed an answer that recognized that "[t]he record of this proceeding, at least those filings now available to newly-joined Wehr, discloses no currently-pending direct claims or causes of action against Wehr." St. Claire and Wehr ultimately entered into a confidential settlement that "limit[ed] [Wehr's] liability and damage exposure."

**E.     Procedural history**

The Insurers filed a declaratory-judgment action in January 2022, requesting that the district court declare the parties' rights and obligations under the three insurance policies. In December 2022, Wehr moved for partial summary judgment, seeking a declaration that Phoenix and St. Paul had a duty to defend Wehr in St. Claire's lawsuit. (Wehr did not seek summary judgment with respect to Travelers Property.) Phoenix responded that the St. Claire lawsuit had

not triggered its duty to defend because St. Claire never asserted a cause of action directly against Wehr, and that, under Kentucky law, commercial-general-liability policies do not cover damages resulting from faulty construction. St. Paul, in turn, argued that it had no duty to defend because St. Claire had issued no written demand alleging liability on Wehr's part, and that, even if it had, Wehr had not specifically agreed to perform in the capacity of a construction manager.

In June 2023, the district court denied Wehr's motion. It held that Phoenix's duty to defend Wehr applied only to suits seeking damages directly against Wehr, meaning that the policy was not triggered by St. Claire's litigation. The court also held that the Termination Letter did not constitute a "written demand alleging liability on the part of" Wehr, and therefore did not trigger St Paul's duty to defend. Finally, the court noted that although Wehr did not appear to seek summary judgment against Travelers Property, Travelers Property also did not have a duty to defend Wehr in the St. Claire litigation for the same reasons that Phoenix had no such duty.

Wehr moved for reconsideration of the order by the district court. The court denied the motion in January 2024.

Because the district court's denial of summary judgment did not constitute a final judgment that would allow Wehr to immediately appeal the district court's decision, the parties entered into a stipulation. They agreed that: (1) the district court's order regarding the lack of any duty by either Phoenix or St Paul to defend "necessarily means that Phoenix and St. Paul also do not owe a duty to indemnify Wehr with respect to the Underlying Action," and (2) the reasoning in the order "would apply equally to Travelers [Property], and would relieve Travelers [Property] of its duty to indemnify." The parties also consented to a "judgment in favor of [the Insurers] on [the Insurers'] Complaint and on all counts of Wehr's Counterclaim, and . . . a declaration stating that [the Insurers] have neither a duty to defend nor a duty to indemnify Wehr with respect to the Underlying Action pursuant to the Policies." But the stipulation expressly preserved Wehr's right to appeal the district court's order. Wehr then filed this timely appeal.

## II.     ANALYSIS

### A.     Phoenix

Phoenix makes two arguments as to why it had no duty to defend Wehr in the St. Claire litigation.  First, it argues that its duty to defend was limited to suits asserting claims directly against Wehr.  Second, it argues that the Phoenix policy did not cover the type of damages alleged by St. Claire.  We will examine the latter argument first.

### i.     *The Phoenix policy "potentially, possibly or might" cover consequential damages to an adjacent building outside the scope of the project.*

The parties agree that Kentucky law governs the interpretation of the insurance policies in question.  Under Kentucky law, "[t]o ascertain the construction of an insurance contract, one begins with the text of the policy itself." *Pryor v. Colony Ins.*, 414 S.W.3d 424, 430 (Ky. Ct. App. 2013).  Phoenix's duty to defend is limited to suits alleging damages "to which this insurance applies."  We therefore must first determine whether the damages alleged in the St. Claire lawsuit were the type of damages covered by the Phoenix policy.  To make this determination, we analyze whether the damages alleged were due to "bodily injury" or "property damage" caused by an "occurrence."

St. Claire asserted claims against Travelers Surety for property damages arising from Wehr's faulty construction.  The Kentucky Supreme Court held in *Cincinnati Insurance Co. v. Motorists Mutual Insurance Co.*, 306 S.W.3d 69, 79 (Ky. 2010), that "faulty construction [does] not constitute an 'occurrence'" within the meaning of a typical commercial-general-liability policy if "the poor workmanship was not an accident."  Like the Phoenix policy, the *Cincinnati Insurance* policy covered only those damages caused by an "occurrence," and it defined an occurrence as an "accident." *Id.* at 72.  The Court observed that if faulty workmanship came within the meaning of an occurrence in commercial-general-liability policies, then "insurance policies would become performance bonds or guarantees." *Id.* at 75.

Wehr argues, however, and Phoenix does not dispute, that unlike in *Cincinnati Insurance*, the property damage alleged in St. Claire's complaint falls into two categories:  (1) Wehr's faulty workmanship on the addition that it contracted to build, and (2) consequential damages caused

by that faulty workmanship to preexisting portions of the main hospital facility that were not involved in the project.  Wehr points to a "general rule" recognized in *Cincinnati Insurance* to argue that the second category of damages could be covered by the policy:

> It appears as if a general rule exists whereby a CGL policy would apply if the faulty workmanship caused bodily injury or property damage to something other than the insured's allegedly faulty work product.  In other words, although a commercial general liability policy does not provide coverage for faulty workmanship that damages only the resulting work product, the policy does provide coverage if the faulty workmanship causes bodily injury or property damage to something other than the insured's work product.  Thus, as we construe it, application of the general rule could lead to coverage if, for example, the [insureds'] allegedly improperly constructed home damaged another's property.  However, we need not definitively decide in this case whether we should adopt this general rule, as the facts do not present a claim that would fall within it.

*Id.* at 80 n.45 (internal quotation marks, parentheses, and citation omitted).

The Kentucky Supreme Court provided more guidance on the applicability of this "general rule" in *Martin/Elias Properties, LLC v. Acuity*, 544 S.W.3d 639, 643 (Ky. 2018).  *Martin/Elias* involved a similar commercial-general-liability policy held by a contractor that was renovating a house's basement.  *Id.* at 640.  The basement renovation was part of a broader project on the home, which had included renovations to the home's upper stories.  *Id.*  The Court held that the policy did not cover damages to the upper floors of the house that were caused by the contractor's faulty workmanship on the basement.  *Id.* at 644–45.  In contrast to *Cincinnati Insurance*, the homeowner claimed damages to *nondefective* portions of the home that were indirectly caused by the poor work of the contractor.  *Id.* at 641.  But the Court noted the language in *Cincinnati Insurance* that "the general rule could lead to coverage if . . . the [insured's] allegedly improperly constructed home damaged *another's* property."  *Id.* at 643.  The Court held that "the facts today do not provide us with an opportunity to adopt this rule because the assertion of damages before us is to [the plaintiff's] property alone."  *Id.*

*Martin/Elias*, 544 S.W.3d at 644, also "note[d] with approval" the application of *Cincinnati Insurance*'s holding in *McBride v. Acuity*, No. 5:10-CV-173, 2011 WL 6130922, at *7 (W.D. Ky. Dec. 8, 2011), *aff'd*, 510 F. App'x 451 (6th Cir. 2013).  In *McBride*, faced with the same fact pattern of faulty workmanship on one area of a building that caused damage to another

area of the same building, where the entire building was part of the construction project, the court held that "[h]ere, as in *Cincinnati Insurance*, the facts do not present a claim that would fall within such a rule because the alleged damage caused by the subcontractor was to [the insured's] work product and not to another's property." *Id.*

Neither *Cincinnati Insurance*, *Martin/Elias*, *McBride*, nor any other Kentucky case has squarely addressed the question of whether the "general rule" described in *Cincinnati Insurance* applies here.  The present case, unlike those cases, involves allegations of damage to property other than the property under construction.  Wehr posits that St. Claire alleged "'water condensation/mold damage' to [St. Claire's] *pre-existing* hospital facilities that were not the subject of the work being performed."  Phoenix does not dispute that St. Claire alleged damages to portions of the hospital facility on which Wehr (and its subcontractors) never performed work and that were outside of the scope of the project.  The language in *Cincinnati Insurance* suggests that this distinction is dispositive.  *See Cincinnati Ins. Co.*, 306 S.W.3d at 80 n.45 ("[A] general rule exists whereby a CGL policy would apply if the faulty workmanship caused bodily injury or property damage to something *other than the insured's allegedly faulty work product*." (emphasis added)).

*Martin/Elias*, on the other hand, casts doubt on this interpretation by emphasizing the ownership of the property.  Although *Cincinnati Insurance* cited damages to property owned by "another" as simply an *example* of damages that might come within the general rule, *Martin/Elias* and *McBride* seemed to cast that factor as a requirement for the rule to apply.  But the property owners in *Martin/Elias* and *McBride* alleged damages only to their buildings that were under construction.  So those cases did not address whether the footnote in *Cincinnati Insurance* applies to damages to a building *owned* by the same property owner but *separate* from the construction project.  The present case, however, presents those facts.  This ambiguity in the scope of the general rule recognized in *Cincinnati Insurance*, a rule not yet adopted by the Kentucky Supreme Court, remains unresolved.

But we have no need to resolve this ambiguity here.  Under Kentucky law, "[i]nsurers have an obligation to defend if there is an allegation which potentially, possibly or might come within the coverage of the policy."  *Ky. Farm Bureau Mut. Ins. Co. v. Blevins*, 268 S.W.3d 368,

371 (Ky. Ct. App. 2008) (citation and internal quotation marks omitted). The duty to defend applies "regardless of the merit of the action," and it "continues to the point of establishing that liability upon which [the] plaintiff was relying was in fact not covered by the policy and not merely that it might not be." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991).

The ambiguity in the present case means that the damages to the preexisting building alleged in St. Claire's lawsuit are the type of damages that "potentially, possibly or might" be covered by Phoenix's policy. *Ky. Farm Bureau Mut. Ins. Co.*, 268 S.W.3d at 371 (citation omitted); *see also Pizza Magia Int'l, LLC v. Assurance Co. of Am.*, 447 F. Supp. 2d 766, 779 (W.D. Ky. 2006) (holding that the duty to defend was triggered despite liability being an "open question in Kentucky" at the time of the lawsuit). We therefore reject Phoenix's argument that the type of damages at issue prevented its duty to defend from being triggered. Accordingly, we must next evaluate Phoenix's remaining defense: that its duty was not triggered because the lawsuit that alleged those damages did not assert claims directly against Wehr.

   ii.   ***Phoenix's duty to defend was not limited to suits asserting claims directly against Wehr.***

"[T]he words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." *Pryor*, 414 S.W.3d at 430 (quoting *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999)). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384–85 (Ky. Ct. App. 2002) (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (1986)). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Marshall v. Ky. Farm Bureau Mut. Ins. Co.*, 618 S.W.3d 499, 502 (Ky. Ct. App. 2020) (quoting *Cantrell Supply, Inc.*, 94 S.W.3d at 385)).

"[A]mbiguous terms are 'strictly construed against the insurer so as not to defeat the policyholder's reasonable expectation of coverage.'" *Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 48 F.4th 645, 648 (6th Cir. 2022) (quoting *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349–50 (Ky. 2021)); *see also Ky. Emps.' Mut. Ins. v. Ellington*,

459 S.W.3d 876, 883 (Ky. 2015) ("[T]he rule of *contra proferentem*, i.e., that an agreement is construed strictly against the drafter, should be used in interpreting insurance contracts."). Under the reasonable-expectations doctrine, "[w]here a person has paid a premium for a policy, the policy should not be read technically to avoid paying benefits." *Ellington*, 459 S.W.3d at 883. "This test looks to the reasonableness of what an insured may believe about coverage, and necessarily relies heavily on the facts." *Id.*

As an initial matter, neither the term "duty to defend" nor Kentucky caselaw expressly limits the duty to suits asserting claims directly against an insured. "Defend" means, broadly, to "do something to protect someone or something from attack." *Defend*, Black's Law Dictionary (12th ed. 2024); *see id.* ("To deny, contest, or oppose (an allegation or claim)"). And the specific circumstances that trigger the duty depend on the text of the insurance policy. For instance, the duty in the St. Paul policy, described in Part I.C.ii. above, could be triggered before any suit was filed at all.

The policy in the present case required Phoenix to "defend [Wehr] against any 'suit' seeking those damages." The meaning of that provision depends on the meaning of the words "those damages" and "suit." Beginning with "those damages," that phrase refers to the previous sentence of the policy, which reads: "We will pay . . . damages because of 'bodily injury' or 'property damage' to which this insurance applies." The damages sought in the St. Claire litigation, as discussed above, arose from property damage that "potentially, possibly or might," *Ky. Farm Bureau Mut. Ins. Co.*, 268 S.W.3d at 371 (citation omitted), be covered by the policy. Also as discussed above, that potential is sufficient to trigger a duty to defend under Kentucky law. The ordinary meaning of "those damages" therefore does not limit Phoenix's duty to defend to suits asserting claims directly against Wehr.

Nor does the meaning of "suit" limit Phoenix's duty to defend to suits involving claims directly against Wehr. "Suit" is defined as a "civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged.'" St. Claire's lawsuit alleged such damages. It was also a "civil proceeding." The drafters of the policy could have, but did not, limit the definition of "suit" to a civil proceeding asserting claims directly against the insured. And "[t]he Court cannot read

words into the contract which it does not contain." *Perry v. Perry*, 143 S.W.3d 632, 633 (Ky. Ct. App. 2004) (quoting *Goff v. Blackburn*, 299 S.W. 164, 165 (Ky. Ct. App. 1927)). The duty to defend Wehr "against any 'suit' seeking those damages" is therefore not limited by its plain language to suits asserting claims directly against Wehr.

The district court opined, and the Insurers argue, that "[f]or the duty to defend clause to have any plausible effect, the suit must seek a claim for damages against Wehr, the insured under the policy. If the duty to defend clause was triggered by any suit generally seeking damages, the clause would be rendered meaningless." *Phoenix Ins. Co. v. Wehr Constructors, Inc.*, No. 0:22-7-KKC, 2023 WL 10675541, at *4 (E.D. Ky. June 14, 2023). In other words, the district court and the Insurers assert that Wehr's interpretation of the duty-to-defend clause would require Phoenix to defend Wehr against any suit that even mentions Wehr, regardless of the parties or the allegations involved. They claim that the only way to rescue the clause from meaninglessness is by interpreting it to apply only to suits asserting claims directly against Wehr.

We are not persuaded because alternative interpretations would also give meaning to the clause. For instance, the duty to defend could be read to apply to suits, like St. Claire's, in which Wehr is a named party and which allege breaches by Wehr, even if Wehr is not named directly as a defendant. In such suits, Phoenix has the practical ability to insert itself by, for instance, filing an answer on Wehr's behalf and participating in mediation or settlement negotiations. The St. Claire suit was in fact centered on allegations against Wehr, despite being brought solely against Travelers Surety, a situation calling for Phoenix to "protect" Wehr. *See Defend*, Black's Law Dictionary (12th ed. 2024). Accordingly, the open-endedness identified by the district court at most renders the duty-to-defend clause ambiguous because it is susceptible to more than one reasonable interpretation.

We must construe Phoenix's duty-to-defend clause "against the insurer so as not to defeat the policyholder's reasonable expectation of coverage," *Wild Eggs Holdings, Inc.*, 48 F.4th at 648 (citation omitted), and interpret it to include suits that allege breaches by Wehr and in which Wehr is a party. This result comports with Wehr's reasonable expectations because, under Kentucky law, Travelers Surety could recover from Wehr any judgment entered against Travelers Surety in the St. Claire litigation. *See* Ky. Rev. Stat. Ann. § 412.080 (West 2024).

And Wehr would be barred from asserting any defenses regarding its breach that were not raised during the performance-bond litigation.  *See id.* (precluding the party sued from "making any defense that might have been made against the original demand [if] the payment was made after and in consequence of a judgment in an action of which he had notice").  As a consequence, the *only* opportunity that Phoenix had to meaningfully defend Wehr in this dispute was during the St. Claire litigation, even though no claims were directly asserted against Wehr.  For these reasons, Phoenix had a duty to defend Wehr in the St. Claire lawsuit once Wehr was joined as a party.

**B.     St. Paul's duty to defend was not triggered because Wehr never "specifically agreed" to serve as a "construction manager."**

We next turn to St. Paul's duty to defend.  Wehr concedes that St. Paul's duty to defend was not triggered unless Wehr "specifically agreed" in the Construction Agreement "to perform in the capacity of a construction manager."  The St. Paul policy does not define the term "construction manager."  Nor does the term appear in the Construction Agreement, which refers to Wehr's role as a "Contractor."

Applying the principles of Kentucky contract interpretation described above, the term "construction manager" is ambiguous because "a reasonable person would find it susceptible to different or inconsistent interpretations."  *Marshall*, 618 S.W.3d at 502 (citation omitted).  In particular, reasonable people might differ on the precise duties that are encompassed within construction management.  *See W. Waterproofing Co., Inc. v. Zurich Am. Ins. Co.*, No. 20-CV-3199, 2022 WL 329225, at \*14–15 (S.D.N.Y. Feb. 3, 2022) (finding the term "construction management" ambiguous).

But St. Paul's policy calls for a particularly precise definition of that term.  The policy contemplates a situation in which Wehr has "specifically" agreed to serve "in [that] capacity." *See Specific*, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or designating a particular or defined thing; explicit.").

Having determined that the text of the policy is ambiguous on its face, we may consider "parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties."

*Vorherr v. Coldiron*, 525 S.W.3d 532, 543 (Ky. Ct. App. 2017) (quoting *Cantrell Supply Inc.*, 94 S.W.3d at 385). And that evidence clearly demonstrates that Wehr did not specifically agree to serve as a "construction manager" in the Construction Agreement, in accordance with the industry's definition of that term.

The Insurers point to a standard AIA form that is called "Standard Form of Agreement between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price." They contrast that form with the AIA form that the parties used for the Construction Agreement, which is called "Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM." This suggests that the industry recognizes a difference between the contractor role that Wehr agreed to perform versus the role of a construction manager. As the Insurers point out, the public record demonstrates that Wehr was aware when it signed the Construction Agreement that a general contractor is distinct from a construction manager because Wehr previously litigated a case in which the parties presented argument regarding the differences between those two terms. *See Ky. State Dist. Council of Carpenters, AFL-CIO v. Wehr Constructors, Inc.*, 1 F.3d 1241, at *1 n.1 (6th Cir. 1993) (unpublished table decision).

Among those differences are that general contractors typically subcontract various aspects of the project—as Wehr did here—whereas construction managers are supervisors with no control over hiring. *See id.* Based on the record before us, we conclude that Wehr did not "specifically agree[]" to "serve in the capacity of construction manager."

Wehr counters by arguing that some of the tasks that it agreed to perform under the Construction Agreement "clearly fit within a common-sense understanding of what a 'construction manager' does." It urges us to look to the dictionary definitions of the terms "construction" and "management," as did the district court in *Western Waterproofing*. The court in that case found that the term "construction management" was ambiguous, but that there was "a reasonable possibility that [a party's] services could be construed as construction management services, based on the plain meaning of the terms." 2022 WL 329225, at *15 (quotation marks and citation omitted).

But unlike the parties in the present case, the parties in *Western Waterproofing* failed to submit extrinsic evidence to clarify the meaning of the term "construction management." That led the court in *Western Waterproofing* to conclude that the definition was "[un]settled." *Id.* The Insurers here, in contrast, have put forth evidence establishing that the term "construction manager" has a precise meaning in the industry that differs from the meaning of "contractor." Furthermore, the question in *Western Waterproofing* was whether a party had agreed to provide "construction management services." We need not make that determination here. Instead, we need only answer the narrower question of whether Wehr "specifically agreed" to "serve in the capacity of a construction manager." Because the record before us unambiguously establishes that Wehr did not agree to so serve, St. Paul's duty to defend was not triggered.

**C.     Travelers Property**

Wehr further argues that the district court erred in concluding that, for the same reasons Phoenix had no duty to defend, Travelers Property also had no duty to defend. As an initial matter, the record is not clear as to whether the district court's observation about Travelers Property constituted an appealable holding rather than dicta. The court acknowledged in a footnote that Wehr "d[id] not appear" to seek summary judgment regarding Travelers Property's duty to defend, but that such a motion "would fail." *See Phoenix Ins. Co.*, 2023 WL 10675541, at *4 n.1. In any event, the parties stipulated that the district court's reasoning with respect to Phoenix "would apply equally to Travelers." But we have declined to follow the district court's reasoning, so whether the two policies still coincide is unclear. After all, the Travelers Property policy is an excess policy, meaning that Travelers Property's duty to defend a suit for damages kicks in only when the damages "are not payable under [another policy]." These features of the Travelers Property policy might necessitate a different determination of Travelers Property's liability. We will therefore vacate and remand the district court's holding regarding Travelers Property (to the extent that there was one) so further proceedings can determine whether it had a duty to defend.

## III.          CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's ruling regarding St. Paul, but **REVERSE** its decision regarding Phoenix, **VACATE** its decision regarding Travelers Property, and **REMAND** for further proceedings as to those latter two insurers.